**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **RAMON GONZALEZ, VICTOR RODRIGUEZ ORTIZ, and ADDELYN MARTE, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) | **CIVIL ACTION NO.  1:19-10290-TSH** |
| **Plaintiffs,** | ) ) |  |
| v. | ) ) |  |
| **XPO LAST MILE, INC., d/b/a XPO LOGISTICS,** | ) ) ) ) |  |
| **Defendant.** | ) ) |  |

**ORDER AND MEMORANDUM ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Docket No. 56)**

**January 10, 2022**

**HILLMAN, D.J.**

Plaintiffs Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte bring this action, on behalf of themselves and all others similarly situated, against defendant XPO Last Mile, Inc. ("XPO"). The plaintiffs are delivery drivers who delivered appliances and other large consumer goods on behalf of XPO, a freight forwarder and logistics services provider, to customers of one of XPO's clients, Lowe's Home Improvement ("Lowes"). The plaintiffs allege that XPO misclassified them as independent contractors in violation of M. G. L. c. 149, § 148B (Count I), failed to provide them the wages and benefits to which they were entitled in violation of M. G. L. c. 149, § 148 (Count II), failed to pay them a minimum wage in violation of M. G. L. c. 151, § 1A (Count III), and was unjustly enriched at their expense (Count IV). As to Counts I and II, the plaintiffs move to certify a class of drivers who performed deliveries in Massachusetts on behalf

of XPO to customers of Lowe's within the period of July 20, 2015 to present, excluding helpers and any drivers who signed contracts with XPO. (Docket No. 56). For the following reasons, the Court *grants* the motion.

### **Background**

XPO provides freight forwarding and logistics services to retailers, such as Lowe's, who sell large consumer goods. When a Lowe's customer purchases an appliance and requests in-home delivery, Lowe's sends information about the delivery to XPO. XPO then organizes the information into delivery routes and contracts with motor carriers to make the deliveries.[1] XPO and Lowe's have a Master Professional Services Agreement ("MPSA"), which incorporates a Statement of Work ("SOW"), defining their contractual relationship. The plaintiffs, working with motor carriers (or "contract carriers"), made deliveries on behalf of XPO to Lowe's customers in Massachusetts during the class period.

Pursuant to the third SOW, effective on August 25, 2016, XPO was required to "[m]anage" drivers by, *inter alia*, providing them with "training on process, product knowledge and customer service expectations," "validat[ing]" their "ability to perform appliance connections and basic customer service," and conducting annual background checks. XPO also was required to measure and report on the performance of drivers, including through customer survey scores, store survey scores, stop completion rates, and percentages of stops made within scheduled timeframes. In addition, the MPSA held XPO responsible for ensuring that its subcontractors complied with the Lowe's code of conduct.

---

[1] XPO is not itself a federally authorized motor carrier.

As of June 2019, XPO's operations manager responsible for XPO's Lowe's business in Massachusetts was Donna Skinner. In that role, Skinner onboarded drivers, scheduled and coordinated deliveries, and handled customer claims. To onboard drivers, Skinner asked each prospective driver to fill out an application, submit a driver's license, photograph, and social security card, and undergo a drug test, a motor vehicle record check, and a background check. Once drivers were approved, she issued them an XPO badge and shirt, both of which she testified they were required to wear when making deliveries. XPO kept certain information about drivers, including the driver's application, license, and social security card, in an electronic database.

To schedule and coordinate deliveries, Skinner sent contract carriers a text message each night "telling them that this driver will be set at this store with this amount of stops for the next day." The contract carriers responded by either agreeing to the assignment or changing the drivers' names. After the assignments were confirmed, XPO created a delivery manifest for each driver, setting an order of deliveries with expected timeframes for each stop.

When drivers arrived at their assigned Lowe's store each morning, they reviewed the delivery manifest and logged on to a mobile application called eTrack, which XPO used to, *inter alia*, track deliveries and communicate with drivers. Drivers then conducted an inventory check, loaded their trucks, and made deliveries in the sequence outlined by XPO in the manifest. Drivers kept XPO updated of their progress throughout the day and notified XPO if they had any issues reaching a customer. At the end of each day, drivers returned to a Lowe's store if, among other reasons, any items could not be delivered.

During delivery, a customer's appliance or property sometimes would get damaged. In those instances, Lowe's would send a claim to XPO, stating the cost of the damage and including a picture of the damage. XPO would collect any other relevant information and forward the claim

to the relevant contract carrier. If the contract carrier did not dispute the claim within seven days, XPO charged the contract carrier for the damage. XPO did not determine whether contract carriers passed the charges onto the drivers responsible for the damage.

XPO paid contract carriers a flat rate per truck per day up to a certain number of base deliveries, with an additional amount for each delivery over the base number. As of June 2019, the flat rate for box trucks was between $485 and $600 per day for up to fifteen deliveries, with $39 to $40 for each additional delivery. In turn, contract carriers paid drivers. The plaintiffs, as drivers, were paid between $100 and $190 per day. As mentioned, when a customer claimed damage done to his or her property, XPO deducted the value of the claim from the amount paid to the contract carrier. The record suggests that contract carriers regularly passed deductions onto drivers. The ten drivers whose testimony is in the record all had deductions taken out of their paychecks.

During the class period, XPO contracted with approximately 240 contract carriers to deliver goods to Lowe's customers in Massachusetts. Some contract carriers had large, multistate operations; others had only one or two vehicles. Contract carriers determined whether to pay drivers as W-2 employees or independent contractors, how much to pay drivers, how to pay drivers (e.g., cash, check, direct deposit), and when drivers could take time off. Contract carriers also made initial hiring decisions, provided on-the-job training, and had final approval over driver assignments.

The named plaintiffs worked as drivers for various contract carriers during the class period, delivering appliances on behalf of XPO to Lowe's customers in Massachusetts. They commenced this action in July 2018 in Massachusetts Superior Court, alleging that XPO violated

Massachusetts classification and wage laws. In February 2019, XPO removed the case to federal court. The plaintiffs now move for class certification.

## Legal Standard

Federal Rule of Civil Procedure 23 sets the requirements for class certification. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346 (2011). Rule 23(a) requires that "(1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative representation of the class be adequate." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008). Rule 23(b)(3) requires that common questions "predominate" over individual questions, and that a class action be a "superior" method of adjudicating the controversy. *See id.*

A plaintiff seeking class certification must "affirmatively demonstrate" by a preponderance of the evidence that the Rule 23 requirements are met. *See Wal-Mart Stores*, 564 U.S. at 350; *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015). A court must test the plaintiff's assertions with "rigorous analysis." *See General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). This may require consideration of the merits. *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013). In considering the merits, when necessary, a court may "test disputed premises," *Tardiff v. Knox County*, 365 F.3d 1, 4 (1st Cir. 2004), and "formulate some prediction as to how specific issues will play out," *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

## Discussion

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Numerosity is a "low threshold." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460

(1st Cir. 2009). "Classes of 40 or more have been found to be sufficiently numerous under Rule 23(a)(1)." *DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 98 (D. Mass. 2010). Here, the plaintiffs assert that the proposed class contains approximately 544 individuals, and XPO does not contend otherwise.[2] Accordingly, the Court finds that the numerosity requirement is met.

*2. Commonality*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims. *Wal-Mart*, 564 U.S. at 350; *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28-29 (1st Cir. 2019). The commonality requirement is a "low bar." *New Motor Vehicles*, 522 F.3d at 19.

The plaintiffs argue that the commonality requirement is satisfied here because their claims challenge XPO's company-wide classification of drivers. They rely on *Ouadani v. Dynamex Operations East, LLC*, 405 F. Supp. 3d 149, 171 (D. Mass. 2019), where a court in this district certified a class of drivers who, while working with contract carriers, made deliveries on behalf of a transportation logistics services company like XPO. There, like here, the plaintiff brought claims for, *inter alia*, misclassification and improper deductions under Massachusetts law and argued that drivers should have been classified as employees of the defendant company because the company had actual control over their work. *See id.* at 161. In addressing the commonality requirement for class certification, the court concluded that common evidence would determine whether the

---

[2] There also is no dispute that the class is ascertainable from objective criteria. *See Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012).

company had actual control over the drivers under the Massachusetts independent contractor statute, M. G. L. c. 149, § 148B. *See id.*

Here, the parties disagree over whether the test in the Massachusetts independent contractor statute applies. The Massachusetts independent contractor statute "establishes a framework for determining whether a worker is an employee or an independent contractor." *Depianti v. Jan-Pro Franchising Intern., Inc.*, 990 N.E.2d 1054, 1066 (Mass. 2013). That framework, commonly referred to as the ABC test, presumes that an individual performing "any service" is an employee unless "the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance and in fact," and "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." M. G. L. c. 149, § 148B; *see also Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1146 (Mass. 2015).

The Massachusetts Supreme Judicial Court ("SJC") recently clarified, however, that not every entity for which an individual performs "any service" is responsible for compliance with the Massachusetts wage laws. *See Jinks v. Credico (USA) LLC*, 177 N.E.3d 509, 516 (Mass. 2021) (citing *Depianti*, 990 N.E.2d at 1068 n.17). As the SJC explained, when Company A contracts with Company B for services, and Company B contracts with third parties to perform those services, Company A "ordinarily" is not liable for misclassification of the third parties, even though the third parties perform services for Company A, because Company B is the agent of the third parties' misclassification. *See id.*

Nonetheless, the SJC has recognized three exceptions to this "ordinary" rule. First, where Company B is Company A's "alter ego." *See Sebago*, 28 N.E.3d at 1147. Second, where Company A engages in an evasive "end run" around its wage law obligations. *See Depianti*, 990

N.E.2d at 1068 n.17; *see also DiFiore v. American Airlines, Inc.*, 910 N.E.2d 889, 897 (Mass. 2009). And third, where Company A is the "joint employer" of Company B's employees. *See Jinks*, 177 N.E.3d at 517-19.

To demonstrate that a company undertook an "end run" around its wage law obligations, a plaintiff must show that the company's arrangement with intermediaries was created "for the purposes of evading wage law obligations." *Jinks*, 177 N.E.3d at 517. To demonstrate that a company is a "joint employer" of a second entity's employees, a plaintiff must show, based on the totality of the circumstances, that the company "has retained for itself sufficient control over the terms and conditions of the second entity's employees." *Id.* at 519. The joint employer test is guided by four factors: whether the company "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* at 520 (quoting *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998)).

Even where an exception to the ordinary rule is met, however, the question whether third-party workers in fact were misclassified may remain unanswered.[3] To answer that question, the ABC test could still apply. *See Segabo*, 28 N.E.3d at 1147 (where separate companies may be held liable for misclassification, correct approach is to consider each company's relationship with the putative employees separately).

---

[3] Application of the joint employer test often presumes that third-party workers are employees, not independent contractors. *See Espinal v. Bob's Discount Furniture, LLC*, 2020 WL 6055123, at *5 (D. N.J. Oct. 14, 2020); *Browning-Ferris Industries of Cal, Inc. v. NLRB*, 911 F.3d 1195, 1214 (D.C. Cir. 2018); *Henderson v. Equilon Enters., LLC*, 253 Cal. Rptr. 3d 738, 752 (Cal. Ct. App. 2019); *Curry v. Equilon Enters. LLC*, 233 Cal. Rptr. 3d 295, 313 (Cal. Ct. App. 2018). It may be the case that evidence sufficient to satisfy the joint employer test ordinarily will be sufficient satisfy the ABC test as well, given the overlap in the tests' focus on the putative employer's control over the putative employee. Because the tests contain some differences, however, both may apply here.

Here, the plaintiffs seek class certification for two claims. The first, Count I, alleges that XPO misclassified the proposed class of drivers as independent contractors, in violation of M. G. L. c. 149, § 148B. The second, Count II, alleges that due to the misclassification, the class of drivers did not receive the wages and benefits to which they were entitled, in violation of M. G. L. c. 149, § 148. The validity of both claims turns on (1) whether XPO may be held responsible for any misclassification, and (2) whether the drivers should have been classified as XPO's employees.[4] Common evidence among the class will answer those questions. As relevant to any test the Court applies (e.g., joint employer and/or ABC), the record indicates that XPO treated all contract carriers alike, and all drivers alike.

XPO's operations manager for Lowe's in Massachusetts, Donna Skinner, testified concerning, *inter alia*, XPO's process of onboarding drivers and scheduling routes, XPO's communication with contract carriers and drivers throughout the workday, and XPO's handling of property damage claims. Nothing in the record indicates that XPO treated drivers differently depending on the contract carrier with which they were associated. Indeed, the plaintiffs, each of whom worked with different contract carriers, had similar experiences relative to XPO, even if certain conditions varied from one contract carrier to another. Whether contract carriers exercised their discretion differently (say, in the number of days they required a driver to work) has no bearing on whether XPO, itself, had a common policy with respect to drivers making deliveries on its behalf. *See Wal-Mart*, 564 U.S. at 465. Just as other courts have found the commonality

---

[4] Violations of M. G. L. c. 149, §§ 148 and 148B, are often linked. *See Depianti*, 990 N.E.2d at 1068 n.15 ("[W]here an employer arranges for its employees to be misclassified as independent contractors, in contravention of G. L. c. 149, § 148B, such arrangement violates the provision in G. L. c. 149, § 148, declaring that '[n]o person shall by special contract with an employee or by any other means exempt himself' from the obligation to pay lawful wages to employees.").

9

requirement met under similar circumstances, *see Espinal v. Bob's Discount Furniture, LLC*, 2020 WL 6055123, at *5 (D. N.J. Oct. 14, 2020); *Ouadani*, 405 F. Supp. 3d at 162, the Court finds the commonality requirement met here.

### 3. Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. To satisfy this requirement, the representative plaintiffs' injuries must "arise out of the same events or course of conduct" as the injuries of the class, and the representative plaintiff's claims must be "based on the same legal theory" as the claims of the class. *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008). The typicality requirement, which tends to merge with the commonality requirement, *see Wal-Mart*, 564 U.S. at 349 n.5, is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." *Payne v. Goodyear Tire & Rubber Co.*, 2016 F.R.D. 21, 24-25 (D. Mass. 2003).

The representative plaintiffs' alleged injuries -- unpaid wages and unpaid benefits -- are representative of the class's injuries. These alleged injuries arise out the same policy of alleged misclassification, based on the same theory that XPO exercised sufficient control over the drivers' work, such that the drivers should have been considered XPO's employees. The Court finds that the typicality requirement is met. *See Espinal*, 2020 WL 6055123, at *6.

### 4. Adequacy

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The moving party must show first that the interests of the representative party will

not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). XPO does not challenge the adequacy of the plaintiffs' representation. Indeed, the Court discerns no conflict between the plaintiffs and the proposed class and understands that the plaintiffs' chosen counsel is well-qualified to prosecute the case. *See Ouadani*, 405 F. Supp. 3d at 163. Thus, the Court finds that the adequacy requirements is met.

### 5. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The inquiry requires "careful scrutiny to the relation between common and individual questions" in the case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). While the inquiry has overlap with questions of commonality and typicality, it is "far more demanding." *New Motor Vehicles*, 522 F.3d at 20 (quoting *Amchem*, 521 U.S. at 624). The "aim" of the inquiry is to "test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (quoting *Amgen*, 568 U.S. at 469).

"In deciding whether individual issues predominate over common questions, a court must not rely on mere speculation that individual issues may arise." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021). Rather, a court must consider "'the probable course of litigation' so as to 'formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate.'" *Id.* (quoting *Mowbray*, 208 F.3d at 298). Rule 23(b)(3) does not require a plaintiff to prove that each element of the claim is

11

susceptible to class-wide proof. *Amgen*, 586 U.S. at 469. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important maters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453 (quotations omitted).

XPO contends that individual issues concerning drivers' employment status will predominate. XPO asserts that because drivers were associated with 240 different contract carriers, each of which had some measure of discretion over various aspects of the drivers' work (such as how the driver was paid), any analysis to determine whether the drivers were employees of XPO necessarily will entail individualized consideration of each driver's relationship with his or her contract carrier. The Court disagrees.

As discussed above, whether XPO may be held liable for any misclassification likely will depend upon application of the joint employer test, which involves consideration of four central factors: whether XPO had the power to hire and fire drivers, whether XPO controlled the drivers' work schedules or conditions of employment, whether XPO determined the rate and method of the drivers' pay, and whether XPO maintained employment records for drivers. Because the evidence suggests that XPO treated all drivers alike, and all contract carriers alike, differences among contract carriers will, for the most part, be inapposite to this analysis. *See Espinal*, 2020 WL 6055123, at *9.

If XPO may be held liable for any misclassification, the question whether drivers should have been classified as XPO employees, rather than as independent contractors, could then depend upon application of the ABC test. For largely for the same reasons as with application of the joint employer test, common evidence likely would determine the outcome of application of the ABC

test. *See Ouadani*, 405 F. Supp. 3d at 164-65. As to misclassification issues, therefore, the Court finds that common issues will predominate over individual ones.

XPO also contends that individual issues concerning improper deductions will predominate. The plaintiffs allege that due to their misclassification, they were subjected to, *inter alia*, unauthorized deductions in violation of M. G. L. c. 149, § 148. As mentioned, when a Lowe's customer complained of property damage caused by a delivery, XPO deducted the value of the claim from the amount paid to the contract carrier responsible for the damage. As XPO notes, however, whether a contract carrier passed that deduction onto the driver responsible for the damage was up to the contract carrier. Therefore, XPO argues, with 240 different contract carriers potentially exercising discretion differently, individual questions will predominate.

Because contract carriers determined for themselves whether to pass on deductions, answering the question whether each contract carrier passed on deductions may require individualized consideration.[5] But even if that is the case, Rule 23(b)(3) does not require that each issue be susceptible to resolution by common proof. *See Tyson Foods*, 577 U.S. at 453. Indeed, individual damages issues are "rarely determinative" of the Rule 23(b)(3) predominance inquiry. *See Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003).

Contrary to XPO's assertion, the issue of deductions, while an important part of the class's claims, is not central to their validity. The crucial liability question is whether the class should

---

[5] It also may not. While contract carriers certainly had the ability to absorb deductions, the record evinces no indication that they in fact did. As the plaintiffs note, all drivers whose testimony is in the record (the three named plaintiffs, plus seven others) had deductions taken out of their paychecks. The one affidavit from a contract carrier, submitted by XPO, is silent on the subject. Though anecdotal evidence may not be used, in this context, to demonstrate that discretion was universally exercised in a certain way, *see Wal-Mart*, 564 U.S. at 358, the suggestion that individual deduction determinations will predominate is somewhat speculative, *see Bais Yaakov*, 12 F.4th at 89.

13

have been classified as XPO employees. If so, they were entitled to be paid as employees under Massachusetts wage laws, which require "prompt and full payment of wages due." *Camara v. Attorney General*, 941 N.E.2d 1118, 1121 (Mass. 2011). In both Counts I and II, the plaintiffs seek recovery for the *wages and benefits* to which they were entitled. Massachusetts wage laws not only prohibit employers from making certain deductions to employee pay, *see Camara*, 941 N.E.2d at 1119, but they also entitle misclassified employees to the employment benefits extended to the employer's other employees, *see Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 748 (Mass. 2009).[6]

The plaintiffs assert that, in addition to the value of any unauthorized deductions, they are entitled to receive the value of benefits that XPO provides its payroll employees, such as vacation time and sick time. While XPO argues that this is a deductions case, and only a deductions case, the plaintiffs' complaint is not so limited. *See* Docket No. 1-1, Compl. at ¶ 22 ("Although XPO offered generous benefits to its employees, Plaintiffs were offered none of those benefits as a result of their classification as independent contractors. Among other things, Plaintiffs were afforded no paid holidays or other paid time off."). Whether drivers, if misclassified, missed out on certain benefits received by XPO payroll employees can be resolved on a class-wide basis, without much

---

[6] XPO argues that *Somers* is distinguishable because *Somers* relies on a statutory provision that states that wages include benefits "due an employee under an oral or written agreement," M. G. L. c. 149, § 148, and here, there was no agreement between the plaintiffs and XPO. But in *Somers* too, there was no agreement for benefits between the plaintiff putative employee and the defendant putative employer. Yet the SJC explained that if the plaintiff was an employee of the defendant employer under M. G. L. c. 149, § 148B, then the plaintiff "did not receive the vacation, holiday, or overtime pay to which [the plaintiff] was legally entitled, or any employment benefits that were extended to other [of the defendant's] employees." *Somers*, 911 N.E.2d at 748-49. Thus, *Somers* indicates that a company's misclassified employees may be entitled, under the Massachusetts wage laws, to benefits extended to the company's properly classified employees, regardless of the existence of an agreement between the plaintiff employee and defendant employer.

regard to the differences among contract carriers. Thus, that individual issues may arise with respect to deductions -- one aspect of the class's alleged damages -- is not enough to defeat class certification at this stage.[7] The Court finds that, on this record, the common, crucial question of misclassification predominates over individual damages questions. Accordingly, the Court finds that the predominance requirement is met.

### 6. Superiority

Rule 23(b)(3) also requires that class adjudication be superior to other available methods for adjudicating the controversy. A class action is a superior method of adjudication when it is seriously questionable that putative class members could litigate on their own. *See Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 67-68 (1st Cir. 2010). The plaintiffs argue that in the absence of class treatment, few other drivers will have the resources, knowledge, or courage to enforce their rights under the Massachusetts wage laws. XPO develops no argument to the contrary, instead asserting that because this case involves multiple employers, the plaintiffs' broad statements concerning superiority do not apply. In the Court's view, the plaintiffs have the better argument. Class actions are particularly appropriate in the employment classification context. *See DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 406 (D. Mass. 2017); *De Giovanni v. Jani-Kind Int'l, Inc.*, 262 F.R.D. 71, 85 (D. Mass. 2009). And even in cases involving intermediary entities, courts have found class treatment to be a superior method of adjudication. *See Espinal*, 2020 WL 6055123, at *9; *Ouadani*, 405 F. Supp. 3d at 167. Accordingly, here, the Court finds that the superiority requirement is met.

---

[7] At bottom, even if some contract carriers did not pass on deductions to some drivers, the fact that XPO may be able to point to evidence specific to those class members to reduce their damages does not, at this stage, warrant denying class certification. *See Tyson Foods*, 577 U.S. at 453.

### **Conclusion**

For the reasons stated, the Court ***grants*** the plaintiffs' motion for class certification. The Court certifies the following class for Counts I and II:

> All drivers who performed deliveries in Massachusetts on behalf of XPO to Lowe's customers within the period of July 20, 2015 to present, excluding helpers and any drivers who signed contracts with XPO.

The Court appoints Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte as class representatives, and Fair Work, P.C. as class counsel.

**SO ORDERED**

*/s/ Timothy S. Hillman*<br>
**TIMOTHY S. HILLMAN**<br>
**DISTRICT JUDGE**