UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RAMON GONZALEZ, VICTOR RODRIGUEZ ORTIZ, and ADDELYN MARTE, on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>RXO LAST MILE, INC., d/b/a RXO LOGISTICS,<br><br>   Defendant. | Civil Action No.<br>19-10290-FDS |

**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**SAYLOR, C.J.**

This is an action for unpaid wages arising out of the alleged misclassification of employees as independent contractors. Jurisdiction is based on diversity of citizenship.

Defendant RXO Last Mile, Inc. ("RXO") is a freight forwarder and logistics services provider that organizes and arranges deliveries of large goods for retail stores. Plaintiffs Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte are drivers who delivered appliances and other consumer goods on behalf of RXO to customers of Lowe's Home Improvement stores.

Plaintiffs allege that RXO misclassified them as independent contractors in violation of Mass. Gen. Laws ch. 149, § 148B (Count 1); failed to provide them wages and benefits in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (Count 2); failed to pay them a minimum wage in violation of the Massachusetts Minimum Wage Law, Mass. Gen.

Laws ch. 151, § 1A (Count 3); and was unjustly enriched at their expense (Count 4). Plaintiffs brought suit on behalf of themselves and a class of similarly situated individuals against RXO.

Defendant has moved for summary judgment on all counts. It contends that under *Jinks v. Credico (USA) LLC*, 488 Mass. 691 (2021), RXO can be found liable to the drivers only if they prove it was their joint employer, and that they cannot do so. Plaintiffs have cross-moved for partial summary judgment as to their status as "employees" of RXO. They contend that *Jinks* does not apply, and that the court should instead utilize the "ABC test" to determine whether they (or companies employing them) were independent contractors.

For the reasons set forth below, both motions will be denied.

I. **Background**

The following facts are undisputed unless otherwise noted.

A. **Factual Background**

RXO Last Mile, Inc. (formerly known as XPO Last Mile, Inc.) is a "freight forwarder that performs logistics services" for retail stores. (Plaintiffs' Response to Defendant's Statement of Facts, ECF No. 149 ("Def.'s SOF") ¶ 1). Those logistics services include "organizing and arranging deliveries" of appliances and other large goods on behalf of its customers to retail purchasers. (*Id.*). In order to perform delivery services, RXO contracts with "independent motor carriers" and pays those carriers for the deliveries that they complete. (*Id.* at ¶¶ 5-6).

One of RXO's customers is Lowe's Home Improvement, a chain of retail stores. (*Id.* at ¶ 7). Between July 20, 2015, and July 13, 2022, RXO "contracted with approximately 293 carriers to perform services for Lowe's." (*Id.* at ¶ 3). The carriers, in turn, engaged individual drivers and helpers to transport goods by truck from Lowe's to customers. (*Id.* at ¶¶ 5, 15).

Although some drivers were also the owners of carriers that contracted with RXO, the class members in this action include only those drivers who did not have written contracts with

RXO.  (Defendant's Response to Plaintiffs' Statement of Facts, ECF No. 153, ("Pls.' SOF) ¶ 78).  More specifically, the class includes "[a]ll drivers who performed deliveries in Massachusetts on behalf of [RXO] to Lowe's customers within the period of July 20, 2015, to present, excluding helpers and any drivers who signed contracts with [RXO]."  (ECF No. 66, 16).

### 1. RXO's Written Agreements

RXO's contractual relationship with Lowe's is memorialized in a 2010 Master Professional Services Agreement ("MPSA").  (Pls.' SOF ¶¶ 19).  Under the MPSA, Lowe's has "the right to reject any Contractor's Personnel whose qualifications, in Lowe's reasonable judgment[,] do not meet the standards considered by Lowe's as necessary for the performance of the Services."  (*Id.* at ¶ 31).  In addition, the MPSA states that "if Lowe's becomes dissatisfied with any of Contractor's Personnel providing the Services for any reason that is not unlawful, Lowe's may notify Contractor of the detail of its dissatisfaction, and, if Lowe's requests, Contractor shall immediately remove that individual from Lowe's and replace that individual with other Contractor's Personnel in accordance with the requirements of this Agreement."  (*Id.*).  RXO disputes, however, that in practice it "required or otherwise enforced the [c]arriers' compliance with Lowe's standards."  (*Id.*).

Various Statement of Work Agreements ("SOWs") also outline RXO's "obligations with respect to particular services and deliverables" for Lowe's.  (*Id.* at ¶¶ 21, 28). [1]  According to one SOW, RXO is "required to use qualified personnel" and must abide by certain "Service Level Expectations," including "specific requirements as to, among other things, when delivery teams are to arrive at a Lowe's store; when they are to depart from the store; when they are supposed to

---

[1] Again, RXO disputes that in practice it "required or otherwise enforced the [c]arriers' compliance with Lowe's standards."  (*Id.*).

3

call customers in advance of a delivery; the steps they are to take to avoid damage to a customer's home; and the need to follow standard procedures for the completion of the delivery, connection of appliances, haul aways, and clean up." (*Id.* at ¶ 26). The SOW also requires RXO to "provide driver team training on processes, product knowledge, and customer service expectations"; "manage the driver teams within that market"; and "perform quality and performance inspections and reporting on the driver teams, delivery process, and overall customer and store service within the market." (*Id.* at ¶ 28).

RXO's contractual relationship with its carriers is memorialized in standard form Delivery Service Agreements ("DSAs"). (*Id.* at ¶¶ 71-72). The standard DSA requires carriers to "provide services in a manner consistent with white glove industry standards" and to "agree[] that all of the employees, subcontractors and agents of its company will comply with identification, security, and appearance standards applicable to in-home delivery." (*Id.* at ¶¶ 73-74).[2]

The DSA also states that a "Contract Carrier may, without prior notice to [RXO], employ or otherwise provide qualified person(s) to assist Contract Carrier in performing the obligations specified by this Agreement," and that a "Contract Carrier agrees that it retains complete and exclusive direction and control over its employees and all those working for it in any capacity." (Def.'s SOF at ¶¶ 29, 38). Plaintiffs contend that despite that contractual language, RXO had "exclusive authority" to determine whether a driver was "qualified." (*Id.* at ¶ 29).[3] In addition,

---

[2] RXO contends that although those provisions do appear in the standard DSA, it did not require or enforce standards of service for carriers. (*Id.*).

[3] Plaintiffs assert that RXO LM took "completed application forms from drivers, consisting of a background check authorization form and a consent form for drug testing, along with [] copies of their driver's license and social security card, as well as photos of the drivers, and submit[ed] the information to RXO LM's fleet services department for approval." (*Id.*).

plaintiffs note that Lowe's could instruct RXO under the MPSA to "immediately remove" personnel providing the agreed-upon services, and that RXO in fact refused to issue a badge to one of the named plaintiffs. (*Id.* at ¶ 38).

As to "the manner and means of performing its obligations," carriers are given "sole control" under the DSA. (*Id.* at ¶ 56). The DSA states that "no officer, agent, or employee of [RXO] shall have the authority to prescribe hours of work, what route the Contract Carrier is to follow, or other details of service," and that "[RXO] will not specify or require that a minimum number of hours or a minimum volume of pickups and deliveries be maintained." (*Id.* at ¶ 47). Plaintiffs, however, maintain that RXO created delivery manifests, and carriers were expected to follow the routes planned by RXO. (*Id.* at ¶¶ 40-41, 45).

### 2. Authority to Hire and Fire

RXO requires drivers to "pass a screening of their driving record, a drug test, and a background check" before performing delivery services for Lowe's. (Pls.' SOF ¶ 50). Drivers who do not pass the background check, drug test, or driving record screening cannot perform deliveries arranged by RXO. (Def.'s SOF ¶ 82). The parties disagree as to whether RXO conducts pre-hire interviews for drivers and whether RXO requires drivers to submit applications. (*Id.* at ¶¶ 33-34). Both parties agree that RXO does not "force the [c]arriers to hire any prospective candidate" and that the carriers "retained discretion about whether to engage any worker." (*Id.* at ¶ 35).

As to the firing or disciplining of drivers, RXO contends that it does not "enforce disciplinary action against [c]arriers' delivery teams," while plaintiffs suggest that RXO does in fact discipline drivers, including by reassigning at least one driver to a "different Lowe's store at Lowe's request." (*Id.* at ¶ 68).

### 3. Supervision and Control of the Class

RXO operations managers, dispatchers, and customer-service representatives communicate directly with drivers through an application called eTrack. (Pls.' SOF ¶ 44). Drivers also use eTrack to "record completion of deliveries and customer sign-off." (*Id.* at ¶ 62). Drivers discuss delivery issues with RXO, but discuss truck-maintenance issues with the carriers. (*Id.* at ¶ 88).[4] RXO maintains, however, that its communication with drivers is infrequent. (*Id.*).

RXO contends that the carriers, not RXO, decide which drivers should deliver which loads. (Def.'s SOF ¶ 45). Plaintiffs, however, contend that RXO makes the "delivery team assignments as part of its normal routing procedure," but permits carriers to "override" assignments. (*Id.*). RXO further maintains that it does not find coverage for delivery drivers when they are absent from work. (*Id.* at ¶¶ 51-52). Plaintiffs, on the other hand, contend that RXO's managers help find coverage when a driver is sick or does not show up for a shift. (*Id.*).

RXO states that its delivery manifests for drivers contain "delivery windows," but does not require drivers to take "certain routes or to complete routes in a certain order." (*Id.* at ¶ 54). Plaintiffs, on the other hand, contend that they are expected to load their trucks according to the manifest and follow the routes planned by RXO. (*Id.*). They also allege that they do not have the ability to change the order of their stops. (*Id.*). Similarly, while RXO contends that it does not "require" carriers to complete a "minimum number of hours or a minimum volume of pickups and deliveries," plaintiffs maintain that RXO expects them to "cover the routes and the deliveries assigned to them by RXO." (*Id.* at ¶ 41). Generally, however, the parties agree that

---

[4] RXO does not provide trucks or other equipment necessary to perform delivery services for plaintiffs. (Def.'s SOF ¶ 72). Carriers own or lease the trucks used for deliveries, handle repairs or problems with the trucks, and provide drivers with most of the tools and equipment necessary for performing delivery services. (*Id.* at ¶¶ 73-75). Carriers also tell drivers where to park the trucks at the end of each day. (*Id.* at ¶¶ 69-70). Carriers, not RXO, maintain insurance covering the drivers, sometimes including workers' compensation insurance. (*Id.* at ¶ 71).

the carriers determine the days and hours worked by delivery drivers, and that drivers request time off from the carriers, not from RXO. (*Id.* at ¶¶ 46, 50).

The carriers, not RXO, train drivers on how to perform deliveries. (*Id.* at ¶ 57). At the same time, RXO's Delivery Process Manual describes "best practices" for Lowe's deliveries, "such as a specific procedure for driver teams to follow when a customer is not at home, including waiting for at least 15 minutes after which they should be given authorization to leave (in most cases, by an [RXO] customer service representative)." (Pls.' SOF ¶¶ 33-34).[5]

The parties dispute the extent to which RXO takes steps to ensure driver quality. It is undisputed that RXO collects driver-performance metrics, including customer-survey scores, store-survey scores, stop-completion rates, and percentage of stops made within a scheduled time frame. (*Id.* at ¶ 30). RXO communicates those metrics to Lowe's and the carriers. (*Id.*). Nevertheless, RXO contends that while it seeks to provide high-quality services to Lowe's, it does "not specifically enforce any customer satisfaction standards, penalize low performers, or take any other action . . . in response to the metrics." (Def.'s SOF ¶ 88). Plaintiffs disagree, noting that RXO provides feedback to drivers, "reduce[s] or eliminate[s]" the Lowe's routes assigned to a driver depending on their performance, reassigns drivers to different Lowe's stores, and rewards drivers for high scores with gift cards. (*Id.*). Furthermore, while RXO contends that it does not conduct audits or ride-alongs to examine performance quality, plaintiffs allege that RXO sometimes follows or shadows drivers to ensure quality. (*Id.* at ¶ 58).

Finally, the parties dispute whether RXO requires drivers to wear a uniform. Plaintiffs contend that RXO provides and requires them to wear an RXO badge, shirt, and sometimes a hat. (*Id.* at ¶¶ 83-84). They also note that they are told that they could not work unless they are

---

[5] RXO contends that the Delivery Process Manual is never shared with carriers or drivers. (*Id.*).

wearing certain clothing.  (*Id.*).  RXO acknowledges that while it expects a "professional appearance" from drivers, it does not provide RXO-branded uniforms and does not penalize drivers for their appearance.  (*Id.*).

### 4. Payment of the Class Members

RXO pays carriers for delivery services, and the carriers in turn pay their drivers.  (*Id.* at ¶ 89).  Although plaintiffs contend that the carriers were "constrained by the pay structure imposed by RXO," the carriers determine the manner and rate of payment for drivers.  (*Id.* at ¶¶ 90, 93-94, 96).  Here, the class members are paid directly by the carriers and do not receive compensation from RXO.  (*Id.* at ¶¶ 91-92).  Members of the class also request raises from the carriers, not from RXO.  (*Id.* at ¶ 95).

While RXO does not deduct payment from drivers for claims of damage to customer property, it deducts those payments from carriers, and the carriers determine whether and how to pass the deduction on to their drivers.  (*Id.* at ¶¶ 97-98).

### 5. Maintenance of Employment Records

RXO collects from the carriers and maintains "a repository of the records reflecting the results of drivers' background check, motor vehicle check, and drug screens."  (*Id.* at ¶ 80).  RXO also maintains "delivery records that detailed information related to each delivery." (*Id.* at ¶ 86).  RXO does not track drivers' hours or maintain payroll records for drivers. (*Id.* at ¶¶ 85, 101).

RXO contends that it does not "maintain in the ordinary course records of deductions charged to the [c]arriers' delivery drivers" or any other "personnel files."  (*Id.* at ¶¶ 102-104).  Plaintiffs, on the other hand, contend that RXO "assigns unique identifiers to each [carrier], driver, helper, route, delivery, claim for alleged damage, and deduction."  (*Id.*).  As a result, RXO can easily "track[] customer damage claims and can readily identify the driver associated

with a particular delivery and the amount to be deducted from a [carrier's] pay." (*Id.* at ¶ 102). Moreover, plaintiffs contend that RXO stores personnel records in a program called Contract Logix, including a driver's name, e-mail address, eTrack login information, the date on which the driver was approved by RXO, the date on which the driver is no longer eligible (if applicable), completed application forms, a copy of the driver's license and social security card, and photos of the driver. (*Id.* at ¶ 104).

**B.     Procedural Background**

On July 20, 2018, plaintiffs Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte, on behalf of themselves and all others similarly situated, filed a complaint against defendant RXO in the Massachusetts Superior Court. The complaint asserts claims for misclassification under Mass. Gen. Laws ch. 149, § 148B (Count 1); violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (Count 2); violation of the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, § 1A (Count 3); and unjust enrichment (Count 4).

On February 14, 2019, defendant removed the action to this court. On April 30, 2021, plaintiffs filed a motion for class certification. On January 10, 2022, Judge Hillman granted that motion, certifying the following class as to Counts 1 and 2:

> All drivers who performed deliveries in Massachusetts on behalf of [RXO] to Lowe's customers within the period of July 20, 2015 to present, excluding helpers and any drivers who signed contracts with [RXO].

(ECF No. 66, 16). On December 15, 2023, the case was reassigned to the undersigned judge.

Defendant has moved for summary judgment on all counts. Plaintiffs have moved for partial summary judgment as to their status as employees of RXO under Mass. Gen. Laws ch. 149, § 148B.

9

## II. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. The Applicable Test

As noted, defendant has moved for summary judgment on all counts. It contends that under *Jinks v. Credico (USA) LLC*, 488 Mass. 691 (2021), RXO can be found liable to the drivers only if they prove it was their joint employer. Plaintiffs have cross-moved for partial summary judgment, contending that *Jinks* does not apply, and the court should instead utilize the "ABC test under Section 148B," the "proper test for the relationship between RXO and the plaintiffs." (ECF No. 132, 8).

10

The independent-contractor statute, Mass. Gen. Laws ch. 149, § 148B, "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of [the Commonwealth's] wage statutes." *Somers v. Converged Access, Inc.*, 454 Mass. 582, 589 (2009).

Under the statute, "an individual performing any service . . . shall be considered an employee" unless the putative employer can make three showings. Mass. Gen. Laws ch. 149, § 148B(a); *see Depianti v. Jan–Pro Franchising Int'l, Inc.*, 465 Mass. 607, 621 (2013). The three showings—which together form a test commonly known as the "ABC" test due to its tripartite structure—are the following:

> (1) "the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact";
>
> (2) "the service is performed outside the usual course of business of the employer"; and
>
> (3) "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

Mass. Gen. Laws ch. 149, § 148B(a)(1)-(3); *see Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327 (2015). The putative employer must establish that all three requirements are satisfied; "[t]he failure to satisfy any prong will result in the individual's classification as an employee." *Sebago*, 471 Mass. at 327.[6]

In *Jinks*, the Supreme Judicial Court clarified that not every entity for which an individual performs "any service" is "responsible for compliance with the wage laws." 488

---

[6] The First Circuit has held, and the parties here agree, that the second prong is preempted by the Federal Aviation Administration Authorization Act as applied to motor carriers, including those "who provide first-and-last mile pickup and delivery services." *See Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 442 (1st Cir. 2016); *see also Massachusetts Delivery Ass'n v. Healey*, 821 F.3d 187, 189 (1st Cir. 2016).

11

Mass. at 696.  The court set forth the "appropriate test to determine whether an entity is an individual's employer under the wage laws."  *Id.*

The SJC explained that when an entity ("Company A") contracts with another entity ("Company B") for services, and Company B in turn contracts with third parties to perform those services, Company A "ordinarily . . . would not be liable for misclassification of the third-party workers."  *Id.* at 697 (quoting *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 624 n.17 (2013)).  Instead, Company B, the "entity for whom the individual *directly* performs services," would be considered "the individual's employer responsible for compliance with the wage laws."  *Id.* at 696 (emphasis added).  Company B, in other words, would be "the agent of any misclassification."  *Id.* at 696 (quoting *Depianti*, 465 Mass. at 624 n.17).

Nevertheless, the court recognized three exceptions to that "ordinary outcome."  *Id.* at 697.  First, Company A can be held liable for Company B's misclassification of an employee when Company B is the "alter ego" of Company A.  *Id.* at 697.[7]  Second, Company A can be held liable for Company B's misclassification of an employee when Company A engages in a "scheme as an 'end run' around its wage law obligations."  *Id.* at 698.[8]  Third, Company A can be held liable for Company B's misclassification of an employee when Company A is the "joint employer" of Company B's employees—that is, when Company A "has retained for itself

---

[7] That determination requires analysis of the following factors:  "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."  *Id.* (quoting *Sebago*, 471 Mass. at 328).

[8] To demonstrate that a company undertook an "end run" around its wage law obligations, a plaintiff must show that the company's arrangement with intermediaries was created "for the purposes of evading wage law obligations."  *Id.*

sufficient control over the terms and conditions of the second entity's employees to be considered the joint employer of those employees." *Id.* at 699-701.

In order to determine whether an entity is a joint employer, it is necessary to examine "the totality of the circumstances of the parties' working relationship, guided by a useful framework of four factors: 'whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.'" *Id.* at 703 (quoting *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998)).

As the *Jinks* court noted, those "factors provide a framework that, in many cases, will capture both the nature and structure of the working relationship as well as the putative employer's control over the economic aspects of the working relationship." *Id.* at 704. At the same time, the court emphasized that "[n]o one factor is dispositive; instead, it is the totality of the circumstances that will determine whether an entity ought to be considered a joint employer." *Id*. In other words, "[t]he determination whether an entity is a joint employer is not a mechanical determination"—the factors are "not etched in stone and will not be blindly applied." *Id.* at 703 (quoting *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Here, defendant contends that "[t]he standard for liability in this case is governed by Massachusetts' test for joint employer liability" under *Jinks*, not the ABC test. (ECF No. 130, 8). It contends that "the relationships among RXO LM, the Carriers, and the Class are identical to the alleged relationships in *Jinks*: RXO LM (Company A) engaged the 293 Carriers (Company Bs) to provide delivery services and those Carriers decided to engage workers to perform the services the Carriers agreed to provide under the DSA." (*Id.* at 9).

13

Plaintiffs, on the other hand, argue that *Jinks* does not apply. First, they contend that "*Jinks* is factually dissimilar" to the case at hand in that "Lowe's is Company A . . . and RXO is Company B." (ECF No. 132, 10-11). Second, they contend that "[t]he joint employment framework does not and cannot establish whether Company B's worker is an employee or an independent contractor." (*Id.* at 12). Third, they suggest that the court should follow the reasoning in *Muniz v. RXO Last Mile Inc.*, a decision in which plaintiffs were granted partial summary judgment "on the question of their status of employees under Prong A of Section 148B." (*Id.* at 4).

In the Court's view, the applicable test is the one set forth in *Jinks*. The Court is unpersuaded that *Jinks* is "factually dissimilar" because "Lowe's is Company A . . . and RXO is Company B." (*Id.* at 10). In *Jinks*, defendant Credico was a broker that provided "regional direct sales services" for its "nationally based telecommunications and energy clients." *Jinks*, 488 Mass. at 693. Credico contracted with DFW to "provide regional door-to-door and other face-to-face sales services for Credico's . . . clients." DFW, in turn "retained the services of three of the plaintiffs—Kyana Jinks, Antwione Taylor, and Lee Tremblay—as salespersons to work on various marketing campaigns in Massachusetts for Credico's clients." *Id.* The *Jinks* court explicitly identified Credico as Company A and DFW as Company B. *See id.*, 488 Mass. at 697. Here, RXO (Company A) provides freight forwarding and logistics services for its national retail clients, including Lowe's. RXO contracted with carriers (Company B) to perform services for Lowe's. The carriers, in turn, engaged individual drivers and helpers to transport goods by truck from Lowe's to customers.[9]

---

[9] At the same time, even though the facts of this case fit squarely within the *Jinks* framework, the ABC test is not necessarily irrelevant. As Judge Hillman noted at an earlier stage of this litigation, "the question [of] whether third-party workers in fact were misclassified may remain unanswered" even after the application of the *Jinks* test. *Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252, 261 (D. Mass. 2022). Therefore, it is possible that "the ABC

The Court is also unpersuaded by plaintiffs' argument concerning the partial summary judgment granted to the *Muniz* plaintiffs. In *Muniz*, the plaintiffs brought suit on behalf of a certified class against defendant RXO. *See Muniz v. RXO Last Mile, Inc.*, 2023 WL 5353749 (D. Mass. Aug. 21, 2023). The court granted partial summary judgment to the plaintiffs on the question of their status as employees under Section 148B. *See id.* The facts in *Muniz*, however, differ from the facts here. The *Muniz* plaintiffs were delivery drivers who contracted *directly* with RXO. More specifically, they were delivery drivers who "signed Delivery Service Agreements ("DSAs") with RXO, worked full-time, and operated less than five trucks a week." *Id.* at *1. Here, the class definition explicitly "exclude[es] helpers and any drivers who signed contracts with [RXO]." (ECF No. 66, 16). As a result, and as defendant notes, *"Muniz* has little . . . relevance here." (ECF No. 143, 8).

### B.  Defendant's Motion for Summary Judgment

Defendant contends that it is entitled to judgment as a matter of law because the undisputed facts show that RXO was not the carriers' drivers' joint employer. (ECF No. 130, 2).

As noted, in order to determine whether an entity can be considered a joint employer, the court must examine "the totality of the circumstances of the parties' working relationship, guided by a . . . framework of four factors." *Jinks*, 488 Mass. at 703. Those factors include "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records," but no factor is "dispositive." *Id.* at 703-704 (quoting *Baystate*, 163 F.3d at 675-76).

---

test could still apply" after the *Jinks* analysis. *Id.* (citing *Sebago*, 471 Mass. at 1147); *see also Gonzalez*, 579 F. Supp. 3d at 261 n.3. That, however, is not a question that is now pending before the Court.

As to the first factor, RXO contends that the record does not establish that it had "authority to hire or fire the [c]arriers' drivers." (ECF No. 130, 12). In support of that position, it points to the contractual terms "governing RXO LM's relationship with the [c]arriers." (*Id.* at 3). According to those terms, carriers "may, without prior notice to [RXO], employ or otherwise provide qualified person(s) to assist Contract Carrier in performing the obligations specified by this Agreement." (Def.'s SOF ¶ 29). At the same time, however, plaintiff contends that RXO required drivers to "pass a screening of their driving record, a drug test, and a background check" before performing delivery services for Lowe's. (Pls.' SOF ¶ 50). Plaintiffs also contend that RXO conducted its own pre-hire interviews for drivers and required drivers to submit applications. (Def.'s SOF ¶¶ 33-34).

As to the firing or disciplining of drivers, RXO contends that it "did not require or enforce disciplinary action against [c]arriers' delivery teams." (*Id.* at ¶ 68). Plaintiffs, on the other hand, state that RXO would provide feedback to drivers, "reduce or eliminate" the Lowe's routes assigned to a driver depending on their performance, reassign drivers to different Lowe's stores, or reward drivers for high scores with gift cards. (Def.'s SOF ¶ 88). Moreover, plaintiffs point to the contractual terms in the MPSA between RXO and Lowe's. According to the MPSA, "if Lowe's becomes dissatisfied with any of Contractor's Personnel providing the Services for any reason that is not unlawful, Lowe's may notify Contractor of the detail of its dissatisfaction, and, if Lowe's requests, Contractor shall immediately remove that individual from the Lowe's and replace that individual with other Contractor's Personnel in accordance with the requirements of this Agreement." (Pls.' SOF ¶ 31).

As to the second factor, RXO contends that the "undisputed record . . . shows that RXO LM did not supervise or control the work and schedules of the Class." (ECF No. 130, 14).

According to the standard DSA, for example, "no officer, agent, or employee of [RXO] shall have the authority to prescribe hours of work, what route the Contract Carrier is to follow, or other details of service," and "[RXO] will not specify or require that a minimum number of hours or a minimum volume of pickups and deliveries be maintained." (Def.'s SOF ¶ 47). Plaintiffs, however, contend that RXO in fact "supervised and controlled the plaintiffs by adopting standard operating practices—such as issuing specific routes to driving teams, controlling appearance (badges and shirts), imposing delivery requirements (order of deliveries, specific delivery windows, call-ahead requirement, haul-away requirement, customer-not-at-home procedures, standard installation procedures, return-to-store requirements, etc.), monitoring drivers during routes, and evaluating driver performance." (ECF No. 147, 15-16). Defendant disputes the existence of nearly all of those practices. For example, plaintiffs contend that RXO provided drivers with an RXO badge, shirt, and sometimes a hat that they were required to wear, while defendants maintain that they did not provide RXO-branded uniforms. (Def.'s SOF ¶¶ 83-84).

As to the third factor, there is no dispute that RXO did not "directly pay the plaintiffs." (ECF No. 132, 16). At the same time, it is also undisputed that "RXO ultimately retain[ed] total control over whether and how much to pay out on customer damage claims as a matter of contract." (*Id.*).

Finally, as to the fourth factor, it undisputed that RXO maintained "records reflecting the results of drivers' background check, motor vehicle check, and drug screens." (Def.'s SOF ¶ 80). It is also undisputed that RXO did not track drivers' hours or maintain payroll records for drivers. (*Id.* at ¶¶ 85, 101). The parties, however, disagree as to whether RXO maintained other records, such as records related to the drivers' pay. RXO contends that it did not "maintain in

17

the ordinary course records of deductions charged to the [c]arriers' delivery drivers." (*Id.* at ¶¶ 102-104). Plaintiffs, on the other hand, contend that RXO "assign[ed] unique identifiers to each [carrier], driver, helper, route, delivery, claim for alleged damage, and deduction." (*Id.*). As a result, RXO could easily "track[] customer damage claims and . . . readily identify the driver associated with a particular delivery and the amount to be deducted from a [carrier's] pay." (*Id.* at ¶ 102).

In summary, many of the relevant facts as to each factor are genuinely disputed. Resolving all doubts in favor of the plaintiff as the non-moving party, and construing the evidence in the light most favorable to it, the question of whether RXO was the joint employer of the drivers cannot be resolved by summary judgment. Defendant's motion for summary judgment will therefore be denied.

### C. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment as to their status as employees under Section 148B. As noted, the Court will apply the *Jinks* framework at this stage of the proceedings. Nevertheless, plaintiffs contend that they should still be entitled to judgment as a matter of law under *Jinks* on the grounds that (1) RXO is the plaintiffs' joint employer and (2) RXO engaged in a scheme to avoid its wage-law obligations.

As set forth above, key questions of fact remain unresolved in this action concerning RXO's status as plaintiffs' joint employer. Accordingly, the Court will deny summary judgment for plaintiffs on that basis.

Under *Jinks*, even if a company is not a joint employer, it can be held liable for another company's employee misclassification when it "engages in a "scheme as an 'end run' around its wage law obligations." *Jinks*, 488 Mass. at 698. To demonstrate that a company undertook an

"end run" around its wage law obligations, a plaintiff must show that the company's arrangement with intermediaries was created "for the purposes of evading wage law obligations." *Id.*

Here, plaintiffs argue that they are entitled to judgment as a matter of law under this theory of liability for two reasons. First, they allege that RXO made a "strategic business decision at some point" that it would "contract with Lowe's and other retailers to provide the service of delivering and installing appliances, but without the costs and liabilities associated with owning a fleet of trucks and employing drivers as direct employees." (ECF No. 132, 12). Second, they allege that the "wildly one-sided nature of RXO's standard form Delivery Service Agreements makes RXO the agent of misclassification." (*Id.* at 13). As examples of that "one-sided nature," plaintiffs point out that RXO paid carriers "based on the number of deliveries," a metric that is "untethered to the actual hourly labor costs for performing those services." (*Id.*). RXO also did not provide "any financial incentives to contract carriers to conduct their businesses as law-abiding employers." (*Id.*).

Here, there is no evidence in the record that RXO's "strategic business decision" not to "employ[] drivers as direct employees" was made for the purposes of evading wage laws. (*Id*. at 12). Indeed, as RXO explains, freight forwarders are not actually permitted to "operate commercial delivery vehicles on the public roads" without motor-carrier authority under 49 U.S.C. §§ 13901-903. (ECF No. 143, 13 n.5). Plaintiffs' allegations concerning the "one-sided nature" of the standard DSA and its lack of incentives similarly lack support in the record. To the contrary, the DSA requires carriers to agree to "pay all contributions, taxes, and other payments or charges required" as well as "comply with all other local, state, and federal laws, regulations, and requirements applicable to its employees or affecting their compensation or conditions of employment." (ECF No. 130, 4). Moreover, plaintiffs provide no authority

19

suggesting that two businesses cannot enter into a contract agreeing to a piece-rate compensation structure.  Therefore, the Court will not grant summary judgment to plaintiff on the basis that RXO undertook an end run around its wage-law obligations.

In short, partial summary judgment will not be granted to plaintiff on the grounds that RXO is their joint employer or that RXO engaged in a scheme to avoid its wage-law obligations.

### IV. Conclusion

For the foregoing reasons, (1) the motion for summary judgment of defendant RXO Last Mile, Inc. and (2) the motion for partial summary judgment of plaintiffs Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte, on behalf of themselves and all others similarly situated, are DENIED.

**So Ordered.**

Dated:  August 7, 2024

/s/ F. Dennis Saylor IV  
F. Dennis Saylor IV  
Chief Judge, United States District Court