**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Civil Action No. 1:19-cv-10290-FDS

RAMON GONZALEZ, VICTOR RODRIGUEZ ORTIZ, and ADDELYN MARTE, on behalf of themselves and all others similarly situated,

Plaintiffs

v.

RXO LAST MILE, INC.,

Defendant

**PLAINTIFFS' REQUEST FOR AWARD OF ATTORNEYS' FEES AND COSTS**

Pursuant to Fed. R. Civ. P. 23, Plaintiffs Ramon Gonzalez, Victor Rodriguez Ortiz, and Addelyn Marte, on behalf of themselves and all others similarly situated, request an award of attorneys' fees and costs in connection with the proposed settlement that resolves the above-captioned class action lawsuit.

**Background**

This case involves claims by delivery drivers against RXO Last Mile, Inc. ("RXO"), formerly known as XPO Last Mile, Inc. or "XPO", a last-mile transportation company that brokers deliveries of appliances and other goods for Lowe's in Massachusetts (among other operations not relevant here). To fulfill its contractual obligations to Lowe's, RXO contracts with motor carrier companies that engage delivery drivers to perform the deliveries RXO arranges on Lowe's behalf. The Plaintiffs are delivery drivers who were engaged by some of the motor carriers with whom RXO contracts. The Plaintiffs filed a Class Action Complaint and Jury

Demand in Massachusetts Superior Court on July 20, 2018. RXO removed the case to this Court on February 14, 2019. (ECF No. 1).

The Plaintiffs' claims focus on two practices: (1) RXO charged deductions to the motor carriers for delivery issues, such as damaged property, which were passed on to them; and (2) RXO should have but did not provide employment benefits to the drivers. Both claims require drivers to prove that RXO was their employer, an assertion that RXO vigorously disputes. RXO contends that drivers are hired and controlled by various carriers that contract with RXO. RXO further contends that even if drivers were its employees, the carriers (not RXO) made final decisions about taking deductions from drivers. And, according to RXO, even if drivers were their employees, the drivers have no viable claim for benefits.

As reflected on the docket, the parties engaged in substantial litigation over the past five years. During the initial discovery period, the Plaintiffs took the depositions of various RXO representatives, including RXO's Operations Manager for its Lowe's operations in Massachusetts, RXO's Vice President of Commercial Accounts, and RXO's Vice President of Technology. The Plaintiffs also obtained thousands of pages of documents from RXO, including contracts, operations handbooks, and other documents detailing its operations. RXO, meanwhile, deposed each of the three Plaintiffs, asking them detailed questions about their delivery work, and obtained records from the Plaintiffs.

On April 30, 2021, the Plaintiffs moved to certify a class, relying on this extensive record to support their position. (ECF No. 56). The Plaintiffs also submitted affidavits from other drivers. (ECF No. 56-14). On January 10, 2022, following a hearing, the Court allowed the Plaintiffs' motion to certify a class. (ECF No. 66). The class was defined as, "All drivers who performed deliveries in Massachusetts on behalf of XPO to Lowe's customers within the period

of July 20, 2015 to present, excluding helpers and any drivers who signed contracts with XPO." (*Id*. at 16). RXO petitioned for interlocutory review of the Court's decision; the First Circuit denied the petition on August 5, 2022. *See* Judgment, *Gonzalez v. RXO Last Mile, Inc*., Case No. 22-8002 (Aug. 5, 2022).

On April 28, 2023, following the Court's certification of a class and RXO's production of class information, notice was issued to members of the Class. No members of the Class opted out. The parties also engaged in an additional round of post-certification discovery. RXO took the depositions of the seven drivers who submitted affidavits in support of the Plaintiff's motion for class certification and the corporate deposition of one of the relevant motor carriers, Next Level Logistics, LLC. For their part, the Plaintiffs obtained voluminous records showing the alleged deductions imposed by RXO, including, for each such deduction, the claim number, whether the claim was approved, the date of the alleged incident, the reason for the deduction, the amount of the deduction, and the associated driver, among other things.

On December 7, 2023, RXO moved to decertify the class (ECF No. 127) and for an entry of partial summary judgment (ECF No. 129). The Plaintiffs also moved for partial summary judgment in their favor. (ECF No. 132). On August 7, 2024, following a hearing, the Court denied the parties' cross motions for partial summary judgment (ECF No. 159) and RXO's motion to decertify the class (ECF No. 160).

In its summary judgment ruling, the Court ruled that the Plaintiffs could not establish RXO's liability based on the test set forth in Mass. Gen. Laws ch. 149, § 148B; instead, they would be required to establish liability using the so-called *Jinks* standard for joint employment. *Id*. at 14, *citing Jinks v. Credico (USA) LLC*, 488 Mass. 691 (2021). That standard is fact-intensive and looks to four non-dispositive factors, including "whether the alleged employer (1)

had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Jinks*, 488 Mass. at 703-704.

Following additional discovery, the parties agreed to participate in a voluntary mediation session on January 24, 2025, using an experienced and well-regarded professional mediator, Hunter Hughes, Esq. The case was not resolved during that session, but the parties made some headway and identified the need for additional data, which RPO later provided. Following the production of that further data, the parties attended a second day of mediation on August 11, 2025. After further negotiations and a proposal by the mediator, a final agreement in principle was reached on August 12, 2025. The parties then negotiated the terms of a formal agreement, in the form attached as Exhibit 1.

**Terms of Proposed Settlement**

The gross amount of the settlement ("Total Settlement Fund") is $2,250,000, to be paid within 35 days of the Court's final approval of the proposed settlement, and includes all payments to class members, Plaintiffs' attorney's fees and expenses, the cost of the claims administration process, service awards, and all employment taxes. The Gross Settlement Fund will be paid into a qualified settlement fund ("QSF") to be set up and administered by a third-party administrator ("TPA"). Class Counsel will be responsible for settlement administration, through the TPA.

Out of the Gross Settlement Fund, the Agreement provides that Class Counsel will seek an award of attorneys' fees equal to one-third of the Gross Settlement Fund, in the amount of $750,000; reimbursement of litigation costs; service awards of $25,000 for each the three Plaintiffs, all of whom have been involved in this litigation for over five years; service awards

for the seven drivers who sat for depositions in the amount of $2,500 each; and the costs of the TPA, who will be selected after a competitive bidding process. The remaining amount of the Gross Settlement Fund will be distributed to members of the Class ("Net Settlement Fund").

Class members will be entitled to pro rata shares of the Net Settlement Fund based on a formula using the amount of their alleged damages for the class period, based on reasonably available records provided by RXO, as well as information provided by claimants on their claim form. Payments to members of the Class will be in two parts: a portion deemed to be wages, for which a Form W2 will issue, and a portion deemed benefits or multiple damages, for which a Form 1099 will issue.

The named Plaintiffs will sign a general and complete release of all claims. Class members will release all wage and hour claims asserted or that could have been asserted under the operative complaint. To receive payment, Class members will be required to submit claim forms, by Court-approved deadlines, adequate for the TPA to prepare information returns and complete tax payments, as appropriate. All amounts in the Net Settlement Fund will be distributed among those class members who have timely submitted the required information, except that Class Counsel may request permission from the Court to designate a portion of the Net Settlement Fund as a reserve fund for handling disputes. This is a non-reversionary settlement, meaning that no amount of the Gross Settlement Fund will be returned to RXO. At the end of the settlement administration process, residual funds will be distributed to a *cy pres* recipient.

**Argument**

Courts frequently favor an award of attorneys' fees from a common fund, as called for by the proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).

When awarding fees from a common fund, the "percentage of the fund" method has substantial advantages over the lodestar method. As the First Circuit observed, the percentage method is less burdensome to administer than the lodestar method. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The court also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time; a loadstar method, in contrast, might give attorneys an incentive to spend as many hours as possible on the litigation and might discourage early settlements. *Id.* When using the percentage method, courts routinely approve fee awards that represent one-third of the settlement fund.[1]

An award of one-third of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to employees who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times,

---

[1] There are numerous examples of cases in which a one-third fee was approved. *See, e.g., Roberts v. TJX Companies, Inc*., 2016 WL 8677312, at *13–14 (D. Mass. Sep. 30, 2016) (awarding fees of one-third of $4,750,000 common fund); *Scovil v. FedEx Ground Package System, Inc*., 2014 WL 1057079, at *5 (D. Me. Mar. 14, 2014) (awarding fees and costs equal to one-third of $5,794,200 common fund); *Beckman v. KeyBank, N.A*., 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (awarding fees of 33% of $4.9 million common fund) (citations omitted); *In re Relafen Antitrust Litigation*, 231 F.R.D. at 82 (awarding fees equal to one-third of $75,000,000 settlement fund).

despite hundreds of hours of work, nothing is recovered. Indeed, class counsel in this case have litigated other cases on a contingency basis in which they expended over $500,000 in attorney time and well over $100,000 in expert fees or other costs and recovered a small fraction of those fees and costs. In other cases, they have recovered nothing, even after years of litigation.

This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"); *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.").

By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

To the extent the Court deems it necessary or appropriate to compare the requested award for fees and costs to class counsel's accrued fees and costs, the requested award is plainly within the range of reasonableness. To date, class counsel have incurred total fees of over $231,250. (Affidavit of Stephen Churchill, Ex. 1, ¶ 10). Those fees have been incurred performing work on extensive discovery (including 13 depositions), a review and analysis of thousands of pages of documents and large data sets, motions to compel, motions for class certification and later decertification, cross motions for summary judgment, lengthy settlement discussions (including two days of mediation), drafting and negotiating a formal settlement agreement, drafting a motion for preliminary approval of the proposed agreement, and handling the ongoing settlement approval and administration process. (*Id*.). Class counsel expect to spend considerably more time with the remaining settlement approval and administration process. (*Id*.).

Under longstanding law, class counsel in common fund cases are entitled to recover a multiplier of their fees and costs. *See, e.g., In re Puerto Rican Cabotage Antitrust Litigation*, 815 F. Supp. 2d 448, 465 (D.P.R. 2011) (citations omitted). Indeed, "courts routinely impose enhanced common fund awards to compensate counsel for litigation risk at the expense of beneficiaries who did not shoulder this risk." *Brundle v. Wilmington Trust, N.A*., 919 F.3d 763, 786 (4th Cir. 2019), *citing In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases" and "[t]here is nothing unfair about contingency enhancements in common fund cases because of the equitable notion that those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it").

Here, the requested award of $750,000 represent a multiplier of only about 3.2, even before the additional legal work that will be required on this case. Other courts have approved

multipliers that are substantially greater. *See, e.g., New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving 8.3 multiplier), *citing In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706, 736 n.44 (E.D. Pa. 2001) (lodestar multiplier in the range of 4.5 to 8.5 was "unquestionably reasonable"). *See also Beckman,* 293 F.R.D. at 481-82 (S.D.N.Y. 2013) (approving multiplier of 6.3 and noting that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers") (collecting cases). As a result, the requested fees in this case are reasonable and in line with settled authority.

In addition, class counsel has incurred out-of-pocket expenses of just over $26,166. (Affidavit of Stephen Churchill, Ex. 1, ¶ 11). Those expenses included costs for filing fees, deposition transcripts, mediation fees, expert analysis, and translation services. (*Id*.) It is well established that counsel who obtain a settlement on behalf of a class are entitled to reimbursement of litigation expenses that were reasonably incurred in connection with the litigation. *In re Fidelity/Micron Sec. Litig.,* 167 F.3d 735, 737 (1st Cir. 1999); *Latorraca v. Centennial Techs. Inc.,* 834 F.Supp.2d 25, 28 (D. Mass. 2011).

**Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve an award of attorneys' fees of $750,000 and litigation costs in the amount of $26,166 from the settlement fund in this case.

RAMON GONZALEZ, VICTOR RODRIGUEZ ORTIZ, and ADDELYN MARTE, on behalf of themselves and all others similarly situated,

By their attorneys,

*/s/ Stephen Churchill*
Stephen Churchill, BBO#564158
Rachel Smit, BBO#688294
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
617-607-3260
steve@fairworklaw.com
rachel@fairworklaw.com

Dated: March 26, 2026

**CERTIFICATE OF SERVICE**

I certify that on this date a copy of the foregoing document was served via electronic mail on counsel of record and will be posted on the settlement website that is available to all settlement class members, at https://rxolastmilesettlement.com.

Dated: March 26, 2026

/s/ *Stephen Churchill*
Stephen Churchill